Case No. 18-1165, et al. Michael Cetta, Inc. DEA Sparks Restaurant Petitioner v. National Labor Union Court Mr. Brooks, Petitioner. Mr. Saunders, for response. Mr. Saunders, for response. Good morning, Your Honors, and happy Law Day. May it please the Court, my name is John Brooks. I appear today on behalf of the appellant, Michael Cetta, Inc., doing business at Sparks Steakhouse. Your Honors, among the essential principles of law is the importance of words, and there are four sets of words that are critical to this case. Locked out, at this time, permanent replacements, and open positions. The record demonstrates clearly that there is no striker who ever claimed to have been discharged. The union itself never claimed that there was a discharge. To the contrary, from the outset, the union took the position that the strikers had been locked out. That fact is fatal to the claim of discharge. It's fatal because of the precedent of the board itself. The lockout was mentioned by the union lawyer in the letter, right? Say again, please. The lockout was raised, it was the union lawyer who mentioned the employees were locked out, right, in his letter? His email? The union treasurer. Isn't the question what the employees think? If there weren't, then the ALJ found they thought they had been discharged. Yes, but there was no effort to elicit testimony from any of the strikers called that, in fact, there was, they felt they had been discharged. It's not a subjective test, it's objective. It is absolutely objective, but in order to apply the reasonably prudent standard, the reasonably prudent attorney, excuse me, the reasonably prudent employee test, you first have to have an employee who believes, based on the employer's conduct, that he or she has been discharged. Is there a case that says that? There is. There are cases. Is there a case that says what you just said? There is no case that... Maybe I just don't know, just tell me what it is, can you say? No, the brief cites the cases from which we extract the principle that there has to be an actual employee. You cannot have a hypothetical... But is there a case that says what you just said? There is no case that specifically rules on this issue. No. But it was not just the lawyer or the treasurer for the union, the union being the sole authorised negotiator for the striking employees, but also the executive director of the union who made that statement, consistently made that statement in the course of negotiations, all of this is in the record. And if we are to look past that fact, then we are into the realm of the hypothetical, which no longer becomes an objective standard, but a retrospective standard that is subjective because the board is coming in, as it did here, and saying after the fact, we believe, we are looking at these circumstances, and we believe that a hypothetical striker could theoretically conclude that he or she had been discharged. And with respect, that is not an objective standard. In the Douglas Autotech case, cited in the brief, is determinative that a striker cannot be both locked out and discharged. That case is ignored by the board in its brief completely. And this court, actually 18 years ago today, Judge Tuttle, in the Brusco, Tug and Barge case, articulated or reiterated the standard that an agency is bound by its own precedent, and if it departs from that precedent, must offer a reasoned explanation for doing so. There is no reasoned explanation here for departing from Douglas Autotech. And respectfully, that case controls the issue of discharge. The issue of the lack of discharge is manifest also by the fact that the executive director of the union testified that had there been a discharge, the union would have filed a charge with the board to that effect, and no such charge was filed in this case. Moreover, we can look to objective, not subjective issues, to determine that there was no discharge, because the strikers learned from third parties unrelated to the employer that they had not been discharged, for example, through the fact that they were not able to access their 401k money. In order to do so, one of the requirements of the plan was that they, in fact, be discharged. Likewise, the maintenance of- Let me go back to your reliance on this, what is it called, Douglas Autotech case. There, the board's saying that a lockout does not sever the employee- employer relationship, all right? But that doesn't get to the issue as it was decided at the ALJ level and then affirmed by the board, does it? In other words, if you're locked out, it's not the same as being discharged, but it doesn't mean that after the union sent a letter talking about lockout, circumstances didn't exist such that the employee had- or a reasonably prudent employee had reason to believe they were fired, namely, not being let back in when they came, saying they wanted- they were ready to return immediately, et cetera, and those circumstances that were relied on. It's not a frozen in time case. It's just, as you say, the two words mean different things, but it doesn't mean they can't both exist at different points in time in an employer-employee relationship. Absolutely correct, Your Honor. But the three instances relied upon by the board here do not support a change of circumstances that gives rise to a discharge. Quite the contrary, the complaint states that the only basis for the discharge is the December 22nd letter from Spark's attorney. The problem with the refusal to be allowed back in under that construct is if it happened, it happened three days prior to that letter. Of course, the refusal to be let back in is inadmissible because it's burdened with double hearsay, as explained in the brief. The only other example given by the board to justify this is a reference to picket line violence in the December 22nd letter. So we have nothing that's after the fact that changes the relationship between the employer and the strikers that would give rise to a discharge. Well, I thought the employer never provided that information after the union had requested it. What violence it was referring to, and then the whole issue about the health insurance, the pension, and one other thing that they relied on. Yeah, the issue about the health insurance, there was one health insurance provider, obviously not controlled by the employer, who sent a notice to an employee that said the COBRA event that occurred was related to termination. There was a second letter that followed that up and clarified that was a result of a reduction in hours. Unfortunately, the benefit provider's form does not include COBRA event because you decided to go on strike. So the fourth item that I was trying to remember was the fact that the employer offered a job to one of the strikers after one of the replacement employees left. Yes, as is required by laid law. But that means that the striking employee, a reasonably striking employee, would make it as well. Well, because, in fact, Your Honor's point demonstrates that the employer, A, had hired permanent replacements, and B, had complied with its obligations under laid law to reinstate those strikers when an open position became available. Well, that's a whole other issue. But I'm just getting into your first point about relying on this Douglas Auto case. But that does not, the reinstatement under laid law, which occurred in August of 2015, was, is not any sort of basis from which an employee could determine that he or she had been discharged. That is, again, that is compliant with the laid law obligation. That is the reason SPARKS, in response to the strike, established the preferential reinstatement or hiring list. And that was provided to the union at the first time it asked for it in the wake of this August reinstatement. Interestingly, the board concedes that the employer affirmatively declared its hiring of permanent replacements no later than May of 2015 at a meeting. Notwithstanding that, the union made no effort to ask for the preferential hiring list until late August of 2015. So obviously, the union did not consider this a critical point, even though it was at the meeting in May and acknowledged that the employer had made this statement at least at that time, if not earlier. And we obviously take the position, as indicated in the briefs, that that was made known earlier on. Moreover, there... One quick question. I want to ask you about a different subject, and that is the adverse inference. About? Yeah. Adverse inference. The adverse inference.  that even if the adverse inference was inappropriate, the error was harmless. And I didn't see any response to that in your reply brief. Did I miss something? No. We addressed the adverse inference directly, which is... Yeah, I know, but I'm asking you about the board's argument that even if you're right, the error was harmless. That is not addressed in the reply brief. I assume that meant you conceded that point. We didn't. Thank you, Your Honor. I appreciate the opportunity to clarify that. We did not concede it. We believe that the adverse inference flows from the issue that the judge, the ALJ, took at the outset, which contaminated the entire decision that she made regarding permanent replacements. And that is that the employer had not produced... No, I think you're missing my point. That's the merits. They say, the board says, well, even if you're right about the adverse inference, it was harmless. I understand that, Your Honor. What I'm trying to point out is that because the ALJ erred, as a matter of fact, that the board had not produced these critical documents, the adverse inference falls when that falls. All right. Anything further? And I will... I had reserved two minutes for rebuttal, and I'll cease at this point. All right. Thank you. All right. Thank you. Good morning, Your Honors. Greg Sotaro for the National Labor Relations Board. May it please the Court. I just wanted to pick up on something that Mr. Brooks said. With regards to the Douglas case. The Douglas case established that you can't discharge employees who are locked out. And the reason that's irrelevant here is that the board found that the employees were not locked out. They were, in fact, discharged. Now, SPARKS relies on the lockout idea because it said in its response to the employer that it perceived the employees had been locked out. The problem, as we've explained in our brief, is that the determination of whether employees are discharged is an objective determination based on what the reasonable employees would believe in their position. I'm sorry, yes? So an employer could think it was locking employees out. But if it did it in a way that created in a reasonable employee the impression that at that very same time he was being fired, it's your position that that employee is discharged? That's correct. The test is from the employee's perspective. Or, might I add, not necessarily if the employee thought he was discharged, but believed or believed that his employment status, had reason to believe that his employment status has changed or was no longer as stable. Exactly. Under the test that sounds like everybody agrees applies. Right. So from whose perspective do we assess the lockout? Do we look at what the employer intended? Do we look at... I was focusing when I was preparing on the perspective and burden for discharge, but I'm just wondering about the analogous question for lockout. You know, I am remiss on that. I'm not sure if the analysis is from a reasonable employee's perspective or what it is. I'm happy to look into that if you'd like. Because in this case, the board found that the employees reasonably thought they were discharged. I didn't go into that. And it could be including some facts that were involved in the lockout that created the reasonable... Sure, of course. The ultimate issue here, Your Honor, is that you have an employer who is saying various things and then relying on the union's perception of those things. But the union's position as the bargaining representative is not to convey or translate how the employees experience the employer's actions. And that's why Sparks can't simply rely on the union's statements in this case. We have to look at how the employees themselves felt about it. Or reasonable employees in their position. Exactly. Reasonable employees in their position. I'm sorry, that was a shorthand. Now, since Mr. Brooks didn't speak at all about the permanent reinstatement issue, I would like to say a couple things about that. And that issue turns on... You mean permanent replacement? Yeah. I'm sorry, permanent replacement. The failure to reinstate. That issue turns on whether Sparks carried its burden to show that the replacements were permanently hired before the Strikers made their offer to return to work. And so the question is, when were the job offers made and accepted? In this case, what the board found, what Sparks does not dispute, is that the job offer letters themselves don't show when the replacement employees accepted Sparks' offer. And Susan Edelstein's testimony does not probative as to that fact either. And Sparks hasn't even tried to contest those findings of the board. So simply on that basis alone, the court should affirm the board's finding. So what's the issue about the records? That's going to clear up any of this? No, the whole records issue is... I'm assuming you're talking about the adverse inference and so on? Yes. Yeah. So there's two points about the adverse inference. First, Sparks doesn't dispute the fact that the legality or the legal reasoning of the board in this case, which is that it had records in its possession that could have helped determine the issue in this case, and it didn't provide them. Could those records have? I'm a little bit confused by that. Because whether people are on the premises and being paid or not, which is what I gather those records go to, doesn't actually answer the terms on which they're there. Are they there as temporary employees? Are they there as permanent replacements? And so it seems like a tempest in a teapot to focus on adverse inference from those records or supportive information in those records. I mean, the whole thing. I don't see its relevance if the point is the nature and understanding of the status of the employees, not whether they were there getting paid. And that's why we said, Your Honor, that the... Mr. Tittle's point, that even if those records had been included, it wouldn't have changed the results because all it would have shown was at what time those employees actually started working and started getting paid. And we know from this court's decision in Gibson Greetings that you can work for an employer for two months before you actually found to be permanent. So I guess it could have proved that they were not there as permanent employees if they had shown they were not there at all. Before we knew what was in them. Right. The reason that they're relevant is, you know, well, maybe these people didn't come until January. True. We want to see whether they're there. But once we know that they were actually there, that's not probative of their permanence or not. Exactly. What the board is saying is you're in a very messy situation here. You don't have specific evidence as to when the employees signed their offer letters. You don't know exactly when they started. Any of that evidence can help, you know, push you in one direction or the other. But that doesn't mean that specifically as to this evidence of when they started working, that would be somehow a silver bullet. You know, the. Well, and it may be. The determinative, the determinative issue. You'd still have. And this is our position in this case. You'd still have to show that the employees actually received these offer letters and signed them, accepted the offer on time. Can you just sum up what the basis is of your position that a reasonable employee in these employees position would have believed that they would discharge? What is the key evidence on that? The key evidence on that is the fact that. Sparks hired security to prevent the employees from even entering the premises. Sparks refused the employees offer to return to work on December 19th at the height of the busy season when Sparks needs staff the most to cater to its clientele. At that moment, Sparks said, no, we don't want you here. And then there is the email that followed a couple of days later or three days later saying, we don't want you here because we think you're a risk to our. And you took the position in argument just a moment ago that just because something's communicated to the union doesn't mean it's communicated to the employees. But it seems like your treatment of Zimmerman letter is inverse to that, where you're saying the fact that a union official gets a letter means that the employees are necessarily on notice of that. With respect, the position I took is slightly different, which is that the union's view, the employer never said it was locking up the employees. They never told the union we're locking up the employees. It was the union's response to the employer saying we think the employees are locked out. And what I was saying is that the union is not, the union's own view of the situation is not, it's not within the union's scope of agency to say what the unions, what the employees believe. If you assume that an agent and a client are communicating, that could be a two-way street. So we agree that within the scope of the union's agency, its job is to serve as an intermediary between the employer and the employees. So when it gets the Zimmerman letter, the employees get the Zimmerman letter. Exactly. But what we're saying is that, and speaking of two-way street, if the employees decide to make an offer to unconditionally return to work, the union transmits that offer to the restaurant. However, where it comes to the employee's own perception of the employer's actions, it's not the union's job to articulate those, whether to the employer or even to the board. And also, it would be unfair to hold the employees responsible for the union's mistake in this case. Now, if there was evidence, if there was evidence that the union had communicated to the employee, locked out, don't worry, that would be a different ballgame. But we don't have anything to say so here. I don't believe I have anything further. I just want to make one quick point, which is that in Sparks' reply, they say that they fully complied with the unlawful solicitation claim. Right. There is, that is untrue, respectfully. There, Sparks has not posted a notice, has not complied with the board's order in this case. And it also waived the issuance opening brief. So we still ask that that be enforced fully. What do you make of the, to the extent that you're saying in the Zimmerman letter, sort of constructively or presumptively communicated to the employees, they make a big deal out of the fact that he says, we aren't able to bring you on at this time, as if maybe they're, you know, treating them as laid law employees and, or employees subject to those obligations. I think that's semantics for two reasons. First, we can't bring you on at this time because we think you're a danger to our clientele, our staff. We think you've, you've trespassed and committed property damage. I, I think the board's inference, which this court defers to, that employees, reasonable employees would consider that as a sign that they're terminated rather than they would look at the fine print to say, oh, we still have a job. I think the board's inference is more reasonable than Sparks' on that point. And I would say that even if there was any, any question on that issue, the further you progress and the longer the employees realize that they're still not being reinstated. On January 8th, the employee, Mr. Zimmerman tells them, we're not reinstating the employees. We, we need to protect the employer's premises. Within a couple of weeks, Sparks cancels its contract as a security agency. So they clearly don't think there's a security risk anymore. And yet they're not reinstating, don't reinstate employees until August. So we respectfully submit, Your Honor, that reasonable employees in that situation would not think that Sparks still has them on its, on its employee list, but believe that they've been discharged. And on that point, Your Honors, if you have no further questions, we ask that the board's order be enforced in full. Thank you. All right. Counsel for petitioner. Thank you, Your Honor. The, the Douglas Auto Tech case does not stand for the proposition that an employer cannot discharge locked out employees. To the contrary, it's, it goes to the issue of the status of the employees and says that when an employer acknowledges that an employee is locked out, the employee has not been discharged. The reverse is applicable here. The union, and Mr. Schauder speaks of a two-way street, but it seems to be running only in one direction, and that's against Sparks, is that the, the union is a conduit for all information coming from the employer, but is not a conduit from the information coming from the employees. The, the lack of a discharge is manifested, again, by the lack of testimony, and, and the burden of proving the discharge is clearly and unequivocally on the general counsel. And that was not done as seen by the, the failure to ask, let alone elicit any testimony from any of the Sparks employees about discharge, about the indicia of discharge. Had they filed a claim for workers' compensation? Had they been able to, to achieve, to retrieve their 401k benefits? And the answer to that question was an unequivocal no. The Zimmerman response has- Those are, those are good points. But they're not in the ALJ's opinion, and we're really looking at it under a substantial evidence lens, I wonder. Yes, but there's no evidence. There's absolutely no evidence in the record, and, and the burden is, is on the, the, the board. What about the evidence? You have been violent thugs. We don't want to even physically let you come into the restaurant unescorted. I want to, if, if I may, Your Honor, I mean, I would like to separate those two issues. Um, you have been violent thugs, as stated in, in, in, not quite those words in the Zimmerman response, is really tailored to, to fit precisely the standard articulated in Avery Heights. And Avery Heights says, you can come forward in, in the existence of picket line violence, you can come forward and you can state that. And as a result of that, you do not have to disclose that you have hired permanent replacements. That's what was done. That's all that was done. Was there picket line violence here? There was no evidence or finding of that, and in fact, in your briefing, you received from that as a reason, and when the case was actually adjudicated, nobody, nobody substantiated any picket line violence. Well, there was actually uncontributed, uncontroverted testimony from the security company itself, a third party, as to what had happened in terms of broken windows. Well, union council asked specifically for the employer to document claims of violence and it never responded. Because the claim of violence was not the, the, the claim of violence was relevant only to the Avery Heights issue. It wasn't a claim of violence that was being used or ever used as a basis for a discharge. Quite the contrary. In the, in the negotiating sessions in January of 2015, to which Mr. Souter made reference, there is testimony that at those meetings, the, the, the status of the employees was reiterated to be active employees. That is inconsistent with discharge. We don't have to look to Douglas Auto Tech to get to the issue of, of discharge being impossible here. Inconsistent with all of the facts in the record. We, we can't look to facts not in the record. So, so you're saying that the employer says to the employees, we're scared of you and we're scared that you're going to harm our patrons and our property. They have a right under Avery Heights to say that rather than we've hired permanent replacements for you because they're permitted, they're shielded in whether they communicate that they've hired permanent. But they're saying that and yet whether that's true or not is not relevant. I mean, if I'm a reasonable employee and I hear my employer saying that to me, that's not going to create an ambiguity in my mind as to whether I've been discharged. I think, I think the answer is the letter has to be viewed and the comment has to be in relationship with Avery Heights. Avery Heights, I mean, does the employee know, oh, that must be, I mean, think about how people take things they shouldn't take personally, quite personally. If you're accused of being really a bully and having, having committed violence, you're going to think, they don't really mean that, that, that they're accusing me of that. I think it's read a little bit out of context because it says, it does not say, we will not return you. It says, we have decided not to return the strikers at this time. We're going to put them through anger management and then return them. No, well, a cooling off period in a strike is not an unusual situation. Right. And that's actually what happened here because had there been an intent not to return, how do we explain the immediate contemporaneous creation of the laid law list and the later use and implementation of the laid law list and the reinstatement of one by one by one, every one of the strikers. And contrary to the statement made by Mr. Sauter, the poster has been placed with respect to the solicitation issue and as pointed out in the brief, we didn't argue that issue because obviously looking at the comments of Mr. Kupovic, it was a statement made in his personal capacity that was contrary to the interests of SPARKS. All right, you're not arguing the merits of that. You say the notice was posted. Yes. Is that in the record? I, no, because it was all post hearing. There was, the record was posted in compliance with the original order of the ALJ. So there would be no basis to put it in the record. I'm unaware of the basis for Mr. Sauter's unsupported statement. Well, presumably he's looking at the record that's before the court. But it's not, there's nothing in the record before the court about what happened post hearing to comply with the ALJ's order. Yes. All right. Finally, if I may. Briefly. I, very briefly, Your Honor, and thank you. The issue of the date of signing of the offer letters is a red herring. The offer letters were not introduced to demonstrate a start date because SPARKS was led to believe that the issue of whether they had hired permanent replacements before the ALJ. The only reason the offer letters were introduced was to demonstrate the number of permanent replacements because the general counsel made no reference in her opening statement before the ALJ that the issue of whether SPARKS had hired permanent replacements was before that body. The only issue raised by the general counsel with respect to the permanent replacements was whether SPARKS had hired enough. And there are two cases that are critical here. The red herring issue about the date of signing the letters is demonstrated by Gibson Greetings. Gibson Greetings, as Mr. Souter acknowledged, the permanent replacements were hired and it wasn't until two months later that the employer unilaterally posted a memorandum saying, this will confirm that all of you are permanent replacements. There was no counter signature required, no statement required, no oral acknowledgement required. And that is what happened here. In answer to your question, Judge Pillard, the commencement of work, and the ALJ was very clear on this, that those records, the weekly tip sheets and the daily tip sheets from the December 15 to December 21st period was direct probative evidence of when the That is the end of that issue. Right. Well, she thought erroneously, it turns out, that they would, first of all, that you hadn't turned them over. And second of all, that they would show perhaps that people hadn't even started working. But it does seem like once you see they're working, you don't actually know on what term until you have some evidence of permanence, which was your client's burden to prove. But the permanence is manifested by the mutual agreement. And the mutual agreement is manifested by reading the offer letter together with the commencement of work. That is gifts and greetings. And that is what happened here. And the judge actually said they would have such records, if they showed these hires had started working on or before December 19th, would have tended to substantiate Spark's position that they were permanent replacements. And that is what happened. And if the court believes that that issue is not capable of being determined now on the record because of the status of those documents, then clearly, under Blake construction, the issue should be remanded to the board with a direction that the records for that the issue of permanent replacements. All right. Thank you. Thank you very much, Your Honor. Thank you, Your Honors. We will take the case under advisement.
judges: Rogers, Tatel, Pillard